**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| United Government Security Officers | ) | |
| of America, International Union, and its | ) | |
| Local 52 | ) | Civil Action No. 07-0173(CKK) |
|         Plaintiffs, | ) | |
| | ) | |
|     -vs- | ) | |
| | ) | |
| Michael Chertoff, et al. | ) | |
| | ) | |
|       Defendants. | ) | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE DEFENDANTS' MOTION TO DISMISS

**I.     Introduction**

Now come the Plaintiffs in the above captioned matter and hereby submit their

Memorandum in Opposition to the Defendants' Motion for Summary Judgment. In short, the

Defendants incorrectly argue that the Plaintiffs have failed to state a claim for mandamus and/or

declaratory judgment on the flawed premise that the Service Contract Act ("Act" and/or "SCA")

does not impose a duty upon DHS to adhere to and implement, via the incorporation of a wage

determination to its service contract with US Protect, the application of the Decision and Order

("Decision") of ALJ Mapes to its service contract with US Protect.  As will be demonstrated, the

Defendants assertion that this Court cannot issue a writ of mandamus or enter a declaratory

judgment against DHS is based upon an analysis that completely misinterprets the Act and

grossly mischaracterizes the duties required of DHS under the applicable federal statutes and

regulations. Thus, since the premise of DHS' Motion is flawed the Court must deny the same.

For the reasons asserted hereinafter, the Plaintiffs request that the Court deny the

Defendants Motion to Dismiss in its entirety. Plaintiffs further request an oral argument on the

Defendants Motion to Dismiss.

## II.    Relevant Background and Proceedings

### A.    History of the Case

This case's origin arises from a petition filed by the Plaintiffs for a hearing under the provisions of subsection 4(c) of the McNamara-O'Hara Service Contract Act, 41 U.S.C. §353 (c), concerning wages paid to its members pursuant to a collective bargaining agreement between Local 52 and US Protect Corporation ("US Protect").  The members of UGSOA Local 52 have been providing security services for federal facilities in the vicinity of San Diego, California, since at least September of 2003 via a service contract between US Protect and DHS. Although the procurement contract between the United States and US Protect was originally issued by the General Services Administration, responsibility for administering the contract was subsequently transferred to the Department of Homeland Security (DHS). [1]

Pursuant to the provisions of 29 C.F.R. §4.10 (c), on December 14, 2005, the Deputy Administrator of the Employment Standards Administration issued an Order of Reference and thereby transmitted the UGSOA's request to the Office of Administrative Law Judges for a hearing.  Accordingly, in a notice issued on January 10, 2006 all interested persons, including US Protect and the DHS, were informed that a pre-hearing conference and a hearing would be held in San Diego on February 8, 2006.  However, when the pre-hearing conference convened, the only entity entering an appearance was the petitioner, UGSOA. [2]  After the hearing convened, UGSOA presented the testimony of three witnesses and submitted 25 exhibits. On February 15, 2006, UGSOA also submitted a post-hearing brief.  An expedited transcript of the hearing was

---

[1] See ALJ Mapes Decision at pp. 1-2, attached as Ex. A to DHS' Motion to Dismiss.

[2] Regarding the failure of the DHS to appear at the hearing, ALJ Mapes noted in his decision that although DHS had received notice of the hearing it had elected not to appear because it does not "intervene in labor disputes between agency contractors and their unions."  Likewise, ALJ Mapes noted that "Although US Protect did not provide a written explanation for its failure to appear, its General Counsel did confirm in a telephone conversation with the undersigned's law clerk that US Protect had received the hearing notice and had elected not to participate in the hearing." Mapes at 2, fn. 1.

received by the Office of Administrative Law Judges on February 27, 2006. On March 7, 2006
ALJ Mapes issued his Decision and Order, finding in favor of the UGSOA. Neither DHS nor US
Protect appealed ALJ Mapes' decision to the Administrative Review Board ("ARB"). Decision
at 2.

Under the statutory scheme embodied within the SCA both the DOL and the contracting
federal agencies, like DHS, which contract with private companies for their services, have an
obligation to honor the purpose of the SCA, which is to make certain that the employees
providing the services are properly paid. Indeed, the overarching purpose of the SCA is to
protect all employees of contractors who furnish services to federal agencies and to establish
minimum compensation rates for wages and benefits.  See *29 C.F.R. 4.103; American Waste
Removal Co. v. Donovan, 748 F.2d 1406 (10th Cir. 1984)*. As will be explained infra, in order to
accomplish this objective, the SCA contemplates that the federal agencies operating under the
same will implement its purpose. Importantly, the Plaintiffs followed the requirements of the Act
to the letter and now there is simply no other place for them to turn in order to obtain the benefits
of the ALJ's decision. Thus the relief sough in this action is not only legally appropriate, it is
necessary due to the exigencies of the circumstances created by DHS' refusal to comply with the
Act.

In what can only be characterized as the ultimate end run on its obligation under the
SCA, the DHS attempts to foist its obligation upon its service contractor, US Protect, arguing in
its Motion that the Plaintiffs should sue US Protect for the unpaid wages. However, DHS'
"throw them under the bus" approach, while intriguing, is nothing more than a red herring
designed to divert the Court's attention from DHS' dereliction of its duties under the SCA.[3]

---

[3] DHS also incorrectly assumes on page 13 that the UGSOA and its members failed to pursue relief under 29 CFR §
4.191. Assuming for the sake of argument that the referenced section is applicable, the evidence will not only show
that the UGSOA has indeed exhausted all possible avenues of the relief with the DOL to obtain the wages in

Amazingly, DHS wants everyone else to do something, when all that is required to resolve this matter is for it to do a very simple act; incorporate the wage determination issued by the Secretary into its service contract with US Protect so that US Protect can receive the funds necessary to pay its employees covered by the subject service contract.

Even more amazing is the fact that DHS is now claiming they have no obligation to do anything regarding the wage determination under the Act, and as such, seek to avoid their obligation to comply with the uncontested Decision and DOL application of the same. Of course this would not be so alarming if it were not for the fact that now, well over one year from the DOL application of the Decision to the contract, the only ones suffering are the nearly 150 service employees who have been deprived collectively of approximately $500,000.00 in wages and benefits; a figure which does not include a computation for overtime or interest on the unpaid wages and benefits.

The question this all begs is what more can the UGSOA and its members do to obtain what ALJ Mapes has given them and the DOL has affirmed? To date, the Plaintiffs have filed and prevailed in a substantial variance hearing in which they obtained an Order directing the DOL Secretary to issue the corresponding wage determination directive to the DHS, which the DOL did, and which DHS has chosen to ignore. Presently, there is simply no other viable forum or remedy available to the Plaintiffs.

### B.     Service Contract Act Proceedings

In general, the Service Contract Act ("SCA") requires that every federal government contract in excess of $2,500 for a principal purpose of procuring services must contain a provision specifying the minimum hourly and fringe benefit amounts that are to be paid to the

---

question, but that the DOL, through its own Solicitor General's office, directed the UGSOA to commence the present mandamus action against DHS in order to have the wage determination applied to the contract. See also First Amended Complaint at ¶¶12-13.

various categories of service employees working on such a contract.  *See* 41 U.S.C. §§351(a)(1),

(a)(2).  These minimum wages and fringe benefits are predetermined by the Wage and Hour

Division of the Employment Standards Administration, which has been designated by the

Secretary of Labor to administer the SCA. Decision at 2.

Under the SCA, two types of wage schedules (which are also known as "wage

determinations") are prepared for inclusion in service contracts.  The first type is a general wage

determination and the wages and fringe benefits contained in such a schedule are based on the

rates which Wage and Hour Division surveys have found to be prevailing for the various

classifications of service employees to be employed on the contract in the locality where the

contract is to be performed.  41 U.S.C. §351(a)(1) and (2).  These wage determinations are

sometimes called "prevailing in the locality" wage determinations.  The second type of wage

determination is issued at locations where there is a collective bargaining agreement between the

service employees and an employer that has been awarded a procurement contract subject to the

SCA.  In these circumstances, the Wage and Hour Division is required by the SCA to specify the

wage and fringe benefit rates from the collective bargaining agreement (including prospective

increases) as the required minimum amounts payable to the service employees working under

the terms of the procurement contract.  Decision at 2.

In addition to the foregoing requirements, subsection 4(c) of the SCA contains a special

provision that applies when (1) there has been a prior contract involving substantially the same

services and (2) the wages for the employees working on the earlier contract were set pursuant to

a collective bargaining agreement.  In particular, subsection 4(c) specifies that:

> No contractor or subcontractor under a contract, which succeeds a contract
> subject to this chapter  and under which  substantially the same services are
> furnished, shall pay any service employee under  such contract less than the
> wages and fringe benefits, including accrued wages and fringe benefits, and any

prospective increases in wages and fringe benefits provided for in a collective-bargaining agreement as a result of arms length negotiations, to which such service employees would have been entitled if they were employed under the predecessor contract: *Provided, That in any of the foregoing circumstances such obligations shall not apply if the Secretary finds after a hearing in accordance with regulations adopted by the Secretary that such wages and fringe benefits are substantially at variance with those which prevail for services of a character similar in the locality.*

41 U.S.C. §353(c) (emphasis added).

In this instance, a substantial variance hearing was held as outlined above, and as a result, ALJ Mapes determined at page 4 of his Decision and Order, that "…the UGSOA has made the necessary 'clear showing' that the compensation being paid to members of Local 52 for providing services covered by the current procurement contract with US Protect for the San Diego vicinity must be immediately increased to $21.54 per straight time hour and that fringe payments for these workers must be simultaneously increased to $2.86 per hour."  ALJ Mapes then ordered the Administrator of the DOL's Wage and Hour Division to "…promptly issue a new wage determination in accordance with this Decision and Order." Accordingly, on August 16, 2006, William Gross sent a letter to DHS advising the agency that the DOL was applying the Decision to the service contract DHS has with US Protect and that the new wage and benefit rates were payable effective March 6, 2006.

### III.    Law and Argument

#### A.    Legal Standard

The Defendant seeks dismissal of the Amended Complaint pursuant to Fed. Civ. R. 12(b)(6) on the basis that the Plaintiffs failed to state claims for mandamus or declaratory relief. However, dismissal is only appropriate "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45, 78 S.Ct. 99 (1957).*  As such, the First Amended Complaint must be construed liberally, accepting as true the allegations contained therein, and the Court must draw all reasonable inferences in favor of the Plaintiffs.

#### B.    Plaintiffs Are Entitled to Mandamus Relief

The Defendants go to great lengths discussing the nature of writs of mandamus and the limited circumstances in which one is issued.  However, the Plaintiffs are not required to prove their case at this point in the proceedings, and certainly not in response to a motion to dismiss. To survive the Defendant's motion, the Plaintiffs need to merely show that they stated a legally sufficient claim.  Therefore, the "extraordinary" nature of the remedy is irrelevant.  What is relevant is the standard for establishing a claim for mandamus, which requires the Plaintiffs to show that they have a right to the relief, that the Defendant had a ministerial duty to provide the relief, and that no other adequate remedy is available (collectively "mandamus standard").  *In re Medicare Reimbursement Litigation, 414 F.3d 7, 10 (D.C. Cir. 2005).*

##### 1.    Right to the Relief Sought

The Defendants argue that the Plaintiffs do not have a right to mandamus relief because the Plaintiffs do not have a private right of action under the SCA, and because the Defendants do not have any duty to act under the SCA.  This analysis erroneously interprets the meaning of the

first part of the mandamus standard.  The test does not require the Plaintiffs to show they have a right to the issuance of a writ.  The term "right to the relief" refers, instead, to a right to the performance of the act sought to be ordered by the writ.  *Laughlin v. Reynolds, 196 F.2d 863 (D.C. Cir. 1952)*.  As will be explained infra, the Act clearly establishes that DHS has a mandatory obligation to incorporate the wage determination into its service contract with US Protect; an event which when completed, triggers an obligation on the part of US Protect to pay the new wages and benefits ordered by the ALJ and as applied by the DOL. Thus, the proper standard only requires that the Plaintiffs establish a right to have an act performed, i.e., the incorporation of the wage determination into the subject service contract. Clearly, the Plaintiffs are entitled to this relief since the Act's purpose and its regulations state that employees must be paid their wages and that the minimum wages are set by the appropriate wage determination. See *29 C.F.R. 4.165*.

## 2.    The Defendants Have a Duty under the Act

The Defendants state that they do not have any duty under the Act to do anything. (Motion at p. 9) In fact, the Defendants brazenly assert that with respect to the Plaintiffs request for mandamus relief against it that under the SCA "… no such duty exists." (Motion at p. 9) [4]  In support of its position, the Defendants state that the Act does not contain any provisions requiring the Defendants to do anything.  The Defendants cite the case of *Danielsen v. Burnside-Ott Aviation Training Ctr., Inc. 941 F.2d 1220 (D.C. Cir. 1991)* extensively to support this point, and in fact, the Defendants' argument follows closely with the language of the *Danielsen* decision. However, *Danielsen* is distinguishable from the case at bar.  In *Danielsen*, the plaintiffs

---

[4] The Plaintiffs Amended Complaint at ¶¶14-25 asserts that DHS, pursuant to the provisions of the Act, has a legal duty to recognize the application of the wage rates to the referenced contract. To the extent that the Plaintiffs' Amended Complaint does not make specific reference to the applicable FARs discussed in this brief, the same may be amended to insert the same. In any event, it is clear that DHS has been sufficiently apprised as to what the Plaintiffs are seeking via their Amended Complaint.

sought a writ of mandamus to compel the Secretary of Labor and the Secretary of the Navy to comply with the Act and to enforce its provisions. *Id*. at 165. The court found that the plaintiffs did not have a right to the relief granted because there is no private cause of action under the Act, and because neither secretary had a duty to enforce wage determinations. *Id*. at 165-168.

In this case, the Plaintiffs are seeking a writ of mandamus to compel DHS to fulfill its statutorily obligation to incorporate the wage determination into its service contract with US Protect, which was triggered when the DOL applied the Decision's rates to the subject US Protect service contract and advised DHS of the same in August 2006. Pursuant to 29 C.F.R. 4.102, the Secretary of Labor is "directed to administer and enforce the provisions of the McNamara-O'Hara Service Contract Act." As noted, the regulations require that employees covered by the Act be paid according to the applicable wage determinations. See *29 C.F.R. 4.165*. Therefore, by the clear language of the regulations, the Secretary of Labor must apply wage determinations to the employees working under the applicable service contract, which is the essence of the "application" process. Indeed, it is via that "application" that the DOL tells the contracting agency that those employees are now entitled to receive a higher wage and benefit rate.

Significantly, in its Motion for Summary Judgment, which was written by the same attorneys who wrote the current Motion, the Secretary of Labor asserts hat she did what she was obligated to do under the Act as it relates to the application of the Decision when it issued the August 16, 2006 letter to DHS. (See *Dept. of Labor's Motion for Summary Judgment, p. 10, Document 9, filed 06/25/07)* In fact, the DOL noted that "…there is no further action that the DOL Defendants can be compelled to take." *Id.* at 10. Undoubtedly, the Secretary of Labor has a statutory obligation to advise DHS that it was applying the Decision to the employees working

under US Protect's service contract with DHS. As such, to assert, as does DHS, that it has no corresponding obligation to then follow the directive given by the very person empowered by the Act to issue such a directive flies in the face of both the spirit and letter of the Act. In essence, DHS is thumbing its nose at the DOL and in so doing is refusing to recognize the legal impact of the DOL's application of the wage determination to the service contract. Furthermore, if DHS' position is correct, it would cause one to question the propriety of even initiating a substantial variance hearing if in fact, at the end of this already lengthy process, an agency could simply ignore the outcome. Clearly, this flies in the face of the Act's intended purpose. As one court notes, "If dereliction in discharging a mandatory duty is alleged and if that allegation is not patently frivolous, both mandamus and injunctive relief are available" and the case must be tried on the merits. See *Carpet, Linoleum and Resilient Tile Layers, Local Union 419 v. Brown, 656 F.2d 564 (10th Cir. 1981)*. Clearly, DHS has been derelict in its duty, as will be demonstrated below.

### (a)    The Defendants' Statutory Duty under the Act

Importantly, once a substantial variance hearing is held and a wage determination is issued by the DOL Secretary, the SCA requires the contracting agency to incorporate the wage determination into its service contract with the service provider. This is clearly mandated in the Federal Acquisition Regulation ("FAR") at 28 CFR §52.222-41(f), which states that the compensation for the service employees employed in the performance of a service contract are to be paid wages and fringe benefits "**determined** by the Secretary of Labor, …, **as specified in any wage determination attached to this contract.**" Clearly, the statutory scheme provides for a substantial variance hearing, the resulting issuance and application of the wage determination, and the "incorporation" or "attachment" of the same into the subject service contract by the

federal agency through which the contract was issued. Ultimately, this was the purpose behind Mr. Gross' August 16, 2006 letter to DHS. Had that letter not been issued and had DOL not applied the wage determination rates to the US Protect contract, then DHS would not have an obligation to do anything under the Act. However, Mr. Gross' letter clearly put DHS on notice that it now had a service contractor with employees providing services under a contract governed by the Act that were legally required to be paid a specific wage and benefit rate, as **determined** by the Secretary of Labor. Upon receipt, DHS had an immediate, peremptory and ministerial duty to proceed with the attachment process so as to give effect to the DOL's determination. In effect, the DOL's application of the wage determination to the US Protect contract becomes tantamount to setting the minimum wage which these particular employees were to be paid for their services. It mattered not if DHS agreed with the Decision or DOL's application of the same to the contract – it had to do it.

This same FAR states that "…the Department [of Labor] will issue a new or revised wage determination setting forth the applicable wage rates and fringe benefits. Such a determination **shall** be made a part of the contract…in accordance with the decision of the…Administrative Law Judge…irrespective of whether **such issuance** occurs prior to or after the award of a contract" This provision clearly sets forth both the duty of the DOL and the contracting agency. As noted, the DOL issues the new wage determination, which it did in this instance on August 16, 2006. But to whom was it issued? Obviously, it was issued to the agency that has the service contract affected by the wage determination as it would only be that agency that could make the wage determination "…part of the contract…", since it is its contract. That is why Mr. Gross' August 16, 2006 letter was directed to DHS, and not to US Protect, as it was incumbent upon DHS, not US Protect, to immediately incorporate the wage determination into

its service contract with US Protect. Only DHS can do that ministerial act. Certainly, that is why the FAR states that "[s]uch a determination **shall** be made a part of the contract..." Thus, DHS, as the contracting agency has a plainly defined, peremptory, ministerial duty under the Act via the referenced FAR to make the wage determination part of its service contract, especially since no other entity can or could legally do that.[5]

Without the performance of this plainly defined, peremptory, ministerial duty the entire wage determination process comes to a grinding halt, since the rights of the parties operating within the context of the service contract are dependant upon the same. For example, if the contracting agency fails to "attach" the wage determination to the contract, the contract provider never has any corresponding contractual obligation to pay the wage determination since the agency has never changed the rates to be paid to the employees working under that service contract. Importantly, the wage determination rates, become the wage and benefit rates for the service employees once incorporated by the contracting agency, after which they become the wages and benefits under any collective bargaining agreement ("CBA") that exists between a service contractor and a union, like the UGSOA and US Protect in this instance. However, until the incorporation process is completed by the contracting agency, the rates remain what they are in the CBA. Ultimately, this will affect a myriad of other labor-management relations, such as contract negotiations and even the obligation of a successor contractor under the Act to pay, as a minimum, the predecessor's wages and benefits during the first year of its operation as a service contractor with a unionized work force. As can be seen, the consummation of the entire wage determination process hinges on DHS' fulfillment of its plainly defined, peremptory, ministerial duty under the Act.

---

[5] The basic contract principle of privity is the driving force behind the FAR's in question since only one in privity with another can alter or change the contract to which they are a party. That is why DOL directs the contracting agency to make the adjustment and this is why the FAR uses the word "shall" in that respect.

As noted, the FAR states that "Such a determination **shall** be made a part of the contract..."

Clearly, when the SCA was enacted, Congress intended to convey to the contracting agency the

obligatory nature of its duty under the Act by using the word "shall". Black's Law Dictionary

defines the word "shall" as follows:

> As used in statutes, contracts, or the like, this word is generally imperative
> or mandatory. In common or ordinary parlance, and in its ordinary
> significance, the term "shall" is a word of command, and one which has
> always or which must be given a compulsory meaning; as denoting
> obligation. It has a **peremptory** meaning, and it is generally imperative or
> mandatory. **It has the invariable significance of excluding the idea of
> discretion, and has the significance of operating to impose a duty
> which may be enforced, particularly if public policy is in favor of this
> meaning, or when addressed to public officials, or where public
> interest is involved, or where the public or persons have rights which
> ought to be exercised or enforced**, unless a contrary intent appears.

Blacks Law Dictionary, 5th Ed., page 1233. (emphasis supplied)

Thus, the use of the word "shall" by Congress not only imposes a duty upon DHS to

follow the Act, but it also removes from it any discretion as to whether it will do so. Ultimately,

DHS has no choice in this matter and its continued insistence that it has no duty under the Act

flies in the face of the plain and reasonable reading of the words in the applicable FARs.

The fact that DHS has an affirmative duty under the Act to incorporate the wage

determination is further supported by referencing 48 CFR § 52.222-43(f) which states that "The

contract price or contract unit price labor rates **will** be **adjusted** to reflect the Contractor's actual

increase…in applicable wages…to the extent that the increase is made to comply with…an

increased…wage determination otherwise applied to the contract by operation of law…". Once

again, the only entity capable of **adjusting** the "contract price" is the contracting agency, DHS in

this instance. Once again, as with "shall", the FAR uses the word "will" when speaking to what

the contracting agency has a duty to do. In this instance, the contracting agency has an

affirmative obligation to change its service contract with its Contractor by **adjusting** the "contract price" or "unit price labor rates" so it reflects the Contractor's actual increase in payable wages under its service contract with the contracting agency. As with the word "shall" Congress clearly expressed what the contracting agency "will" do in order to make this process work as intended. Again, Black's Law Dictionary is instructive as it defines the word "will" as an "…auxiliary verb commonly having the mandatory sense of 'shall' or 'must.' It is a word of **certainty**..." *Black's at 1433, emphasis supplied*.

And why "will" or "must" DHS do this act of adjusting? That question is answered in the balance of the subject FAR which provides that once the wage determination is incorporated into the service contract the Contractor has the right to seek an adjustment to its compensation under the service contract to reflect the increase in the wages and benefits it now **must** pay its service employees pursuant to the incorporation of the wage determination into the service contract by the contracting agency. Accordingly, the FAR states that, once the wage determination has been incorporated into the service contract by the contracting agency, the "…Contractor shall notify the Contracting Officer of any increase claimed under this clause within 30 days after receiving a new wage determination…".  In this case, US Protect has not even received the new wage determination from DHS.

Importantly, and contrary to DHS' argument at page 12 of its brief, the employer, or "Contractor" to use the terms of the FAR, does not "retain the primary responsibility for ensuring that its employees are paid in accordance with the applicable wage determination. Rather, and as explained above, it is the contracting agency which has the primary obligation to set the process in motion under the FAR by adjusting the contract to reflect the DOL's application of the wage determination rates contained in the service contract. Once the

contracting agency does this, the Contractor is then obligated to pay wages and benefits commensurate with the wage determination, which the contracting agency has just statutorily made part of its service contract.  Thus the Contractor's role is secondary to that of the contracting agency. If, and only if, the Contractor refuses to pay the incorporated wage determination does the FAR then state that the Contractor may be liable for the amount of any "underpayments" due to the employees performing under the contract. In fact, 48 CFR § 22.1022 states that if the Contractor fails to pay the adjusted wages that the "contracting officer", who is employed by the contracting agency, has the right to withhold the amount needed to pay such **underpaid** employees from the accrued payments due **on the contract**. Of course, this provision simply affirms the fact that the incorporation of the wage determination into the contract by the contracting agency has occurred, which then creates an affirmative obligation on the part of the Contractor to pay the increased wages and benefits now mandated by the modified service contract and to apply for an adjustment to its compensation under the service contract.[6] Consequently, DHS has an affirmative statutory obligation to comply with the ALJ's Decision by in turn "attaching" and "adjusting" its service contract with US Protect to mirror the DOL's application of the new rates to the service contract. Until DHS does this, everyone is in limbo while it waits for DHS to act.

Of course, the problem in this instance is that the contracting agency, DHS, will not follow the directive of the DOL Secretary as contemplated by the SCA. Instead, DHS incorrectly argues that the appropriate action is for the UGSOA to sue US Protect; however, it fails to

---

[6] DHS argument at page 12 of its brief regarding the meaning of the word "effective" in the FAR seriously strains the plain meaning of that term as used in 28 CFR 52.222-41. Clearly, the use of the word "effective" does not relate to the wage determination being made part of the contract, since only DHS can do that. Its meaning is simply that for the purpose of computing the amounts due that the time frame runs from the  date of the ALJ decision. This of course is why Mr. Gross in his letter of August 16, 2006 to DHS references the effective date of the application as being March 6, 2006, since that is the date of the ALJ Decision and the date DHS should use in computing the amount for the adjustment to the contract.

identify under what theory or law that claim would be brought. However, until DHS incorporates the wage determination into the service contract, US Protect does not have a corresponding obligation to pay the wage determination since it has not been "attached" or "incorporated" into its service contract with DHS. As such, all it is obligated to pay are the wages and benefits contained within the CBA between it and the UGSOA. The right to pursue US Protect will not even theoretically accrue until DHS incorporates the wage determination into its contract with US Protect, at which time US Protect can apply within 30 days for the necessary funds from DHS to pay the increased wages. If and only if US Protect refuses to pay the new wage rates **after** incorporation of the same will the UGSOA have the right to pursue them for payment of wages as outlined and contemplated in 29 CFR 4.191, or otherwise under applicable federal labor laws and the CBA's grievance procedure.

Additionally, DHS' suggestion that the Plaintiffs should sue US Protect would create a log jam of litigation as it would provide motivation for contractors to delay the payment of the new wage rates opting instead to force its employees or their unions to initiate suit to obtain the new wage rates. Clearly, Congress did not intend for the employees covered by the Act to have to go to court to get paid. Rather, and as noted, the overarching purpose of the SCA is to **protect** all employees of contractors who furnish services to federal agencies and to establish minimum compensation rates for wages and benefits. See *29 C.F.R. 4.103.* In this case, DHS' duty to act was initiated by the Secretary of Labor pursuant to her authority under the Act. Importantly, DHS does not deny that they have refused to incorporate the wage determination into their service contract with US Protect. This being the case, the Court can easily determine that it has not acted in a manner consistent with its statutory obligations under the Act.

The court in *Danielsen* held that if the Tenth Circuit approach outlined in *Brown* were followed, the court would review whether the defendants ignored their duty or simply did not perform it fully. *Danielsen, 746 F.Supp. at 167*. In *Danielsen*, the defendants did issue wage determinations and **were** paying back wages so a writ of mandamus was not an available remedy. However, the court did cite the *Brown* decision for the following language:

> Where an agency completely ignores the purpose of the controlling statute, as the defendants did in this case, there cannot **be any rational basis in law to support its decision**. A reviewing court would be doing less than its duty if it failed to set aside the agency action. By holding an agency accountable to its lawful duties, **the administrative process will be vindicated**.

*Brown*, 656 F.2d at 568 (emphasis supplied).

In this instance, there is simply not any rational basis, legal or otherwise, for DHS to support its decision to not incorporate the wage determination into its service contract with US Protect. Furthermore, the purpose of the Act is to protect all employees of contractors who furnish services to federal agencies and to establish minimum compensation. See *29 C.F.R. 4.103; American Waste Removal Co. v. Donovan, 748 F.2d 1406 (10th Cir. 1984)*. Here, the Plaintiffs' members are not being paid the minimum wages set by the Act for services being performed for the Defendants. Contrary to DHS' assertion in footnote 10, the Secretary of Labor properly applied the rates to the contract, which in turn required the Defendants to then incorporate the wage determination into its service contract with US Protect. For over a year, the Defendants have ignored the directive and the purpose of the Act: the protection of, and payment of wages and benefits to its service employees. This Court must hold the Defendants accountable for ignoring their duty, and cannot allow them to hide behind its contrived arguments. In short, the Court must vindicate the administrative process.

Based on the foregoing, it is erroneous for the Defendants to assume that to establish its case, the Plaintiffs had to show that the Defendants had a duty under the Act to enforce wage determinations. On the contrary, the Plaintiffs simply had to allege that the Defendants did not perform a mandatory duty.  In any event, the Plaintiffs have met this burden by establishing that the Secretary of Labor notified DHS of its application of the wage determination rates to the subject service contract, which in turn obligated DHS to incorporate or attach the new wage determination to its service contract as contemplated within the FAR at 28 CFR 52.221-41, which they have failed to do. Thus, the Defendants Motion must be denied.

### 3.    There is No Alternate Remedy

With respect to the last prong of the mandamus standard, the Defendants argue that the Plaintiffs have an alternate remedy and are thus precluded from seeking a writ of mandamus. (Motion to Dismiss, p. 11)  The Defendants further state that what the Plaintiffs are truly seeking is payment of wages, a remedy that must be sought from the employer via another procedure under the SCA provided primarily in 28 CFR 4.191.  However, no alternate remedy exists and the First Amended Complaint is clear that what the Plaintiffs seek is a writ compelling the Defendants to comply with the Act by  incorporating the wage determination into the US Protect service contract so that the employer can  then proceed to pay the adjusted wages and apply for compensation for the same.

In making their argument, the Defendants erroneously assume that the Act does not impose an affirmative duty on DHS to do something. If the Plaintiffs only sought payment of wages under the Act, as the Defendants assume, their argument may be correct.  But the Amended Complaint clearly states that the Plaintiffs seek DHS' fulfillment of its duty under the Act as explained above, which in turn will create an obligation on the part of US Protect to pay

the wages mandated by the wage determination.  That is not a matter concerning a violation of the Act and, therefore, cannot be raised in the administrative remedy provisions contained in 29 C.F.R. 4.191.[7]

Moreover, DHS' assertion at pages 13 and 14 of its brief that there is a readily available remedial scheme under the SCA available to the Plaintiffs is patently disingenuous. In the DOL's Motion for Summary Judgment filed earlier in this matter (Document 9, filed 06/25/07), the same attorneys touting these alternate remedies as a viable alternative for the Plaintiffs painted a dramatically different picture and in so doing spelled out quite candidly that the enforcement proceedings to which they now direct the Plaintiffs are, as far as the DOL is concerned, discretionary at best, even noting in a footnote that "While 41 U.S.C. section 354(b) authorizes a limited cause of action to recover underpayments, it contains **no mandate** to do so."[8] Thus, the alternate remedy now proposed by DHS, by its own counsels' admissions, is nothing but a hopeless dead end, the exhaustion of which would be futile at best.

In any event, the section of the Act to which DHS refers is not applicable until the employer refuses to pay the applicable wages mandated by the wage determination, which, as explained supra, cannot happen until DHS incorporates the wage determination into its service contract with the Contractor and adjusts the contract price to reflect the increase.[9]

### C.    Plaintiffs Are Entitled to a Declaratory Judgment

#### 1.    Plaintiffs Have Underlying Jurisdiction

[7] Once DHS does what it is obligated to do and if US Protect refuses to pay the adjusted wages this provision may provide a process for addressing that event. However, we have to get their first.

[8] See Document 9 at page 9, footnote 6; emphasis supplied. Also see pages 7 through 10 of Document 9, where the same attorneys in this case spend 4 pages explaining that the DOL's decision to seek enforcement against US Protect is discretionary.

[9] The incongruity of this argument is further demonstrated by the fact that the provision of the Act to which DHS refers to in this argument provides for the withholding of payments from the contractor who has in turn either timely applied for and/or received the necessary funds to pay for the increase in the wages and benefits of its employees. Amazingly, DHS conveniently ignores that the contractor receives the money to pay the increase from DHS which is why of course the contracting officer would start withholding payments. If it did not, the contractor would have a wind fall by paying wages lower than required while pocketing the increased contract base price!

In their Motion to Dismiss, the Defendants argued that the Plaintiffs lack jurisdiction to bring a claim for declaratory relief because the Plaintiff failed to establish a right to relief under the mandamus statute, 28 U.S.C. 1361.  However, as argued above, the Plaintiffs do have jurisdiction to bring a claim under the mandamus statute.  This jurisdiction also provides the basis to bring a claim for declaratory judgment pursuant to 28 U.S.C. 2201 and 2202 since the requested declaration arises out of an event occurring due to the statutory scheme established by the SCA. Thus the Court has jurisdiction to declare the parties rights and responsibilities under the SCA via the Declaratory Judgment Act.

### 2.    Plaintiffs Stated a Claim Upon Which Relief Can Be Granted

The Defendants next argue that the Plaintiffs' claim for declaratory judgment must analyzed with an eye towards the action the Plaintiffs "would have brought" to enforce their rights.  Since, the Defendants argue, that action would be under the Act, and the Act does not provide for a private cause of action, the claim must be dismissed.  However, the Defendants have, as discussed supra, completely misinterpreted the Act as well as the burden under a 12(b)(6) motion.

As stated previously, a Fed. Civ. R. 12(b)(6) motion tests the legal sufficiency of a claim, not the factual merits.  The allegations in the Amended Complaint must be taken as true.  It is not appropriate at this stage to "analyze" the declaratory judgment claim for the action that would have been brought to enforce the Plaintiffs' rights.  The case cited by the Defendants for this proposition, *Mylan Pharm., Inc. v. Thompson, 268 F.3d 1323 (D.C. Cir. 2001)*, involved a review of a trial court's decision on the merits of the claim for declaratory relief, not on the decision of the trial court to dismiss for failure to state a claim, as is the case here.  Such a stringent "analysis" as proposed by the Defendants is wholly inappropriate.

The Plaintiffs properly brought claims for a writ of mandamus to require the DHS to comply with its statutory duties under the SCA and for a declaratory judgment establishing the scope and extent of the Decision and Order.[10]  Analyzing the latter claim to determine whether an underlying action has merit goes well beyond determining if the Plaintiffs properly stated the claim.

### 3.    There is An Actual Controversy

The Defendants are correct in their rendition of the elements necessary to state a claim for declaratory judgment.  The Plaintiffs must allege that there is an actual controversy between the parties.  *28 U.S.C. 2201, 2202.*  An actual controversy is one in which there are adverse legal interests that are immediate and real, and warrant the issuance of a declaratory judgment.  *Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941).*

The Defendants argue such a controversy does not exist because: 1) they have no duty to do anything under the Act, and 2) it will only become immediate and real if and when the employer fails to pay the appropriate wages.  (Motion to Dismiss, pp. 18-19)  As discussed supra, this argument fails for many reasons.

First, the adverse legal interests as alleged in the Amended Complaint are the Plaintiffs' interests in having the Defendants incorporate the wage determination into US Protects service contract, which in turn will require the payment of wages and benefits by US Protect; an event which has not and cannot happen until DHS is forced to fulfill its duties under the Act.  (Amended Complaint, ¶14-27)  Since the Court is required to take the allegations as true, it is sufficient to meet the requirement of pleading an adverse legal interests.

---

[10] Footnote 10, on page 19 sheds light on the arguments that the DHS will be making regarding the ALJ's decision, further demonstrating the basis for the Court's issuance of a declaratory judgment regarding the meaning of the ALJ's decision, which the Plaintiffs maintain is perfectly clear.

Second, the Defendants' assert that "if a dispute arises, that dispute will be between the employees and their employer for any alleged underpayment." (Motion to Dismiss, p. 18) In essence, the Defendants are re-drafting the Amended Complaint, assuming their own allegations, and then arguing against them, not to mention having completely misinterpreted the Act. However, that is not a proper analysis. The allegations in the Amended Complaint state that the dispute is over the Defendants' failure to abide by its duties under the Act and to follow the Department of Labor's application. The Defendants' failure to act has resulted in the non-payment of wages to the Plaintiffs' members for over a year. Clearly, this is an immediate and real dispute which arises under the Act.

Lastly, the declaratory judgment sought would establish the scope and extent of the Decision and Order so as to avoid any effort on the part of DHS to revise the same and/or partially adopt it. This judgment would be conclusive and not a legal opinion based on a hypothetical set of facts. As such, the Plaintiffs have stated a claim for declaratory judgment and the Defendants Motion to Dismiss must be denied.

### 4.    The August 16th Letter As a Final Agency Action

In their last argument, the Defendants assert that the Plaintiffs' claim for declaratory relief must be dismissed because: 1) it is not apparent how the August 16th Letter can be binding upon the Defendants, 2) the August 16th Letter did not constitute a final agency action, and 3) the administrative process concerning application of the wage determination has not concluded. Ultimately, these are all fact driven questions and as such are not appropriate in a Motion to Dismiss.

Once again, the Defendants have heightened the analysis required for a Fed. Civ. R. 12(b)(6) motion into an adjudication on the merits. The Plaintiffs are not required to establish

the effect of the proposed declaratory judgment, or answer the above noted questions. Moreover, there are not any requirements that the agency action addressed by the proposed declaratory judgment be final or that an administrative process be concluded.  The Plaintiffs are simply required to allege facts sufficient to establish the elements of a claim.  As discussed in the previous section, the Plaintiffs have stated a claim for declaratory judgment, including the appropriate elements. DHS' assertions are simply ludicrous when the Act is read as intended as previously argued.

In any event, and contrary to DHS' representations in its brief, the DOL has already represented to this Court, via the very same attorneys now asserting otherwise, that it has fully complied with its duties under the Act and that the August 16, 2006 letter is indeed the DOL's final statutorily obligated action until DHS fulfills its duties by incorporating the wage determination into the subject service contract. See *DOL Motion for Summary Judgment at page 10-11; Document 9, filed 6/25/07*. Accordingly, DHS' assertions in this regard are disingenuous to say the least.

## V.    Conclusion

Throughout their Motion to Dismiss, the Defendants have misinterpreted and misapplied the standard used to judge a motion made pursuant to Fed. Civ. R. 12(b)(6).  Instead, they have made assumptions against the Plaintiffs, applied a heightened standard, assumed facts, ignored facts which must be taken as true, and have so strained the interpretation and application of the Act that it is hard to succinctly summarize their position in this matter.  In any event, the Plaintiffs have pled facts sufficient to state a claim for a writ of mandamus and declaratory judgment and deserve a trial on the merits of the case so that the employees impacted by this event can receive the wages to which they are entitled.

Wherefore, Plaintiffs respectfully request that this Court deny the Motion to Dismiss in its entirety. Plaintiffs further request oral argument on this matter if in the Court's judgment, the same is needed to clarify the issues presented by this case.


Respectfully submitted,


/s/
_____
Leslie Deak, Esq. [PA0009]
**Law Offices of Leslie Deak**
1200 G. Street, N.W.
Suite 800, No. 099
Washington, D.C.  20005
deaklaw@comcast.com

/s/

_____
John A. Tucker (0052055 – OH.S.Ct.)
**John A. Tucker Co., L.P.A.**
1 South Main Street, Suite 301
Akron, OH   44308
Phone:  (330) 253-7100
Fax:      (330) 253-2500
jatucker@jatuckerlaw.com

ATTORNEYS FOR PLAINTIFFS,
INTERNATIONAL UNION, UGSOA and
UGSOA LOCAL 52

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served via the Court's ECF system this 2nd day of October, 2007 upon all counsel of record.

*/s/ Leslie Deak*

Leslie Deak, Esq. [PA0009]